**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 11-cr-80187-BLOOM**

**UNITED STATES OF AMERICA,**

**v.**

**ARMANDO ANTONIO CASTRO,**

  **Defendant.**
_____/

**UNITED STATES OF AMERICA'S RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582**

**I.     INTRODUCTION**

The United States of America, by and through the undersigned Assistant United States Attorney, hereby responds in opposition to movant Armando Antonio Castro's motion for compassionate release or home confinement based on the COVID-19 pandemic (Docket Entry ("DE") 139).  The government opposes the defendant's motion for release because the § 3553(a) factors strongly weigh against granting him early release.  The government agrees that the defendant has exhausted his administrative remedies.  The government also agrees that the defendant, who is 72 years old, has Type 2 diabetes and chronic kidney disease.  The government acknowledges that, during the current COVID-19 pandemic, an inmate who presents Type 2 diabetes or chronic kidney disease, as confirmed by medical records, and who is not expected to recover from that condition, presents an extraordinary and compelling reason that would allow compassionate release under the statute and guideline policy statement, even if that condition in ordinary times would not allow compassionate release.  However, because the § 3553(a) factors strongly weigh against granting the defendant early release, government opposes his motion.

1

## II.     PROCEDURAL HISTORY

On February 10, 2012, the defendant pled guilty to Counts 1,2, 3, 7, 10, 13 and 14 of a 14-count Indictment.  (DE 43).  Counts 1 and 3 charged distribution of a detectable amount of marijuana, in violation of 21 U.S.C. § 841(a)(1), Count 2 charged carrying a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A), Counts 7 and 10 charged possession of a firearm while under a restraining order, in violation of 18 U.S.C. § 922(g)(8), Count 13 charged distribution of a detectable amount of cocaine and marijuana, in violation of 21 U.S.C. § 841(a)(1), and Count 14 charged unlicensed firearms dealing, in violation of 18 U.S.C. § 922(a)(1)(A).  (DE 3).  On May 26, 2012, the defendant was sentenced to 156 months' imprisonment and five years' supervised release.  (DE 58).  The defendant appealed and the Eleventh Circuit affirmed.  (DE 96).  On January 26, 2015, the defendant filed a motion to reduce sentence (USSC Amendment 782), which was denied.  (DE 109, 117).  On February 24, 2015, movant filed a § 2255 motion, which was denied (Case No. 15-cv-80239-Ryskamp, DE 20). Various other post-conviction motions to reduce or vacate sentences (unrelated to the instant pleading) were filed and likewise denied.

According to the Bureau of Prisons website, the defendant's release date is November 22, 2022.  The defendant has been in custody on this case since his arrest on October 26, 2011.  (See DE 4, 16).  Prior to filing the instant motion with the Court, the defendant filed a reduction in sentence request ("RIS") with the Bureau of Prisons on or about July 30, 2020.  See Attachment 1. That request was denied on or about September 21, 2020.[1]  See Attachment 2.  The BOP also denied a request from the defendant for home confinement.

---

[1] The defendant also file an RIS with the BOP in 2016, which was also denied.  See Attachments 3 and 4.

### III. OFFENSE CONDUCT

A summary of the offense conduct, taken from paragraphs 10 through 27 of the Presentence Investigation Report (PSR), is as follows (to which there were no objections).

In late 2009, as part of an investigation into human trafficking, the defendant was identified as the operator of an illegal prostitution house/brothel at his rental property in Loxahatchee, Florida. On October 8, 2008, Castro was named as the respondent of a non-expiring order of protection (domestic violence injunction). This order prohibited Castro from possessing any firearms or ammunition.

On January 4, 2010, two deputies of the Palm Beach County Sheriff's Office (PBSO) working in an undercover capacity (UC1 and UC2) went to the residence, which had been identified by a cooperating source (CS) as a brothel where illegal immigrant females were being prostituted. UC1 and UC2 were there to investigate Castro for prostitution, on the premise that they could be hired to install multiple cameras within the home and the bedroom utilized by the prostitute to view them engaged in illegal sexual activity. UC1 and UC2 and Castro discussed possible negotiations of trading marijuana for the installation of the surveillance equipment in a second home (brothel) and possibly a marijuana grow house. Castro told them he controlled a grow house that was expected to produce between 60 and 70 pounds of marijuana. During this meeting, UC1 and UC2 observed Castro's prostitution business in full operation. Castro explained the women work Monday through Sunday, with a different woman working each week. Prior to UC1 and UC2 leaving the residence, Castro stated he could obtain women from any race and cultural background. On January 6, 2010, during a telephone conversation, Castro explained to UC1 the prices and types of sexual services provided by the prostitutes.

On January 22, 2010, UC1 and UC2 met with Castro at his Gruber Lane residence and purchased 502 grams of marijuana for $3,500. While inside Castro's bedroom, Castro showed UC1 and UC2 an AK-47 assault rifle and a .22 caliber rifle with a scope. UC1 and UC2 also observed that Castro was wearing a black semi-automatic pistol in his waistband. During this meeting, Castro offered UC1 prostitution services, which UC1 declined and stated he would just wait for the marijuana.

On January 26, 2010, UC1 contacted Castro regarding the installation of the surveillance system. During the conversation, Castro explained he wanted to capture sexual acts, but more importantly, the exchange of money between the prostitute and the customers. Installation was confirmed for February 2, 2010. Due to a delay by UC1 and UC2, Castro's surveillance system was subsequently installed by another party.

On February 11, 2010, UC1 and UC2 met with Castro at the Gruber Lane residence and purchased 227.1 grams of marijuana for $1,750. Again, UC1 and UC2 observed Castro wearing a black semi-automatic pistol on his waistband.

On May 4, 2010, UC1 met with Castro at his Gruber Lane residence to discuss various criminal activities, to include Castro's prostitution business and the ability of Castro to sell firearms to the UC1 and UC2. Also discussed was the possibility of UC1 selling him two kilograms of cocaine, for Castro to re-sell to another individual.

On May 12, 2010, UC2 met Castro at his Gruber Lane residence and discussed UC2's purchase of additional firearms. UC2 told Castro he had just returned from transporting multiple firearms across the United States border to Mexico. UC2 inquired about assault rifles, and Castro, in the presence of UC2, contacted the firearms supplier. Castro relayed to the third party that UC2 wanted assault weapons and they would be transported out of the country right away.

On October 7, 2010, UC1 and UC2 met with Castro at his Gruber Lane residence and purchased 252 grams of marijuana for $3,000, and one Winchester 22L Model 190 rifle (SN B1198048). During the transaction, Castro went outside twice and discharged the firearm into the woods behind the home to prove the weapon functioned properly.

On March 8, 2011, UC1 met with Castro at his Gruber Lane residence and purchased a Taurus Ultra light revolver (SN CW32430), a Taurus Model 945, .45 caliber semi-automatic pistol (SN NCX55249) with two magazines and sixteen rounds of ammunition; and a Taurus Model Judge unknown caliber revolver (SN DP181190). UC1 also purchased a Taurus Model 24/7 semi-automatic 9mm pistol with an obliterated firearm, with two magazines, for $2,300. Subsequent investigation revealed these aforementioned firearms were reported stolen from a location in Miami-Dade County.

On June 7, 2011, UC2 met with Castro at his Gruber Lane residence and purchased 111.7 grams of marijuana; three Taurus Ultralight Model 85 revolvers (SNs DMM73374, CV21237, and CX48047); a Taurus Model PT938 semi-automatic pistol (SN KVK02554); a loaded Taurus Model PT145PRO (SN NCX61748); and two loaded magazines that contained 22 rounds of .45 caliber ammunition for $3,700. Subsequent investigation revealed these aforementioned firearms were reported stolen from the same location in Miami-Dade County.

On June 14, 2011, UC2 met with Castro at his Gruber Lane residence and purchased a loaded Smith & Wesson Model 2505 revolver (SN N765258); six rounds of Winchester .45 caliber ammunition; and a Colt Model Lawman MK III, .357 magnum revolver (SN J79122), equipped with a "Tasco" red dot electronic laser sight for $1,300.

On August 11, 2011, UC2 met with Castro at his Gruber Lane residence and purchased 43 grams of marijuana. During the meeting, the UC discussed his purchased of additional weapons as well as the sale of a large amount of cocaine.

On September 13, 2011, at Castro's Gruber Lane residence, UC2 purchased 54 grams of marijuana and another UC purchased 2.2. grams of cocaine from Castro. During this meeting, UC2 discussed an exchange of one to two kilograms of cocaine for a large cache of firearms.

On October 25, 2011, a sealed Indictment was filed in this case and an arrest warrant was issued.

On October 26, 2011, agents from Alcohol, Tobacco, Firearms and Explosives (ATF), the Federal Bureau of Investigation and PBSO executed the warrant. Castro was read his Miranda rights, which he initially invoked. He subsequently voluntarily waived his rights and agreed to be interviewed by agents. Castro identified his firearm supplier (identified unindicted co-conspirator), and he had purchased at least nine firearms which were sold to UC2. Castro stated that he only made $100 per firearm. Regarding his prostitution business, Castro stated that females between the ages of 22 and 30 came to the residence to "drink and dance with guys," from approximately noon to 7:00pm. No one stayed at the residence overnight, including Castro, because the area was unsafe. He noted that all of the females left the location via their own transportation.

Castro signed a written consent to search his Gruber Lane residence. During a search of the residence, law enforcement recovered a Taurus gun case, a Norinco SKS 7.62 x 39 rifle (SN 54864), a Taurus Model PT58 .380 ACP (SN  KCV06073), which had been reported stolen, various types of ammunition, a Jimenez Arms Model J.A., 9mm pistol (SN 071837), marijuana, cocaine and approximately $1,000 in cash.   ATF verified that Castro was not a licensed firearms dealer at any time relevant to the aforementioned transactions.

(PSR ¶¶ 10-27).

## IV.    THE BUREAU OF PRISONS' RESPONSE TO THE COVID-19 PANDEMIC

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period and that has resulted in massive disruption to our society and economy. In response to the pandemic, the Bureau of Prisons ("BOP") has taken significant measures to protect the health of the inmates in its charge.

5

The BOP has explained that "maintaining safety and security of [the BOP's] institutions is [the BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, the BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, the BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts at the Centers for Disease Control ("CDC"), including by reviewing guidance from the World Health Organization. On March 13, 2020, the BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, the BOP has repeatedly revised the Action Plan to address the crisis.

Beginning on August 5, 2020, the BOP implemented Phase Nine of the Action Plan. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters for a period of at least 14 days, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, the BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step will limit transmissions of the

6

disease. Likewise, all official staff travel has been cancelled, as has most staff training. All staff and inmates have been and will continue to be issued facemasks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms.

Social and legal visits were stopped on March 13th in order to limit the number of people entering the facility and interacting with inmates. To ensure that familial relationships are maintained throughout this disruption, the BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff. Further details and updates of the BOP's modified operations are available to the public on the BOP's website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, the BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the BOP, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has

also acted to enhance the BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, the BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of the BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516. On April 3, 2020, the Attorney General gave the Director of the BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. *See* Federal Bureau of Prisons, *COVID-19 Home Confinement Information*, at https://www.bop.gov/coronavirus/. Taken together, all of these measures are designed to sharply mitigate the risks of COVID-19 transmission in a BOP institution. The BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But the BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, the BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time when interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time when Probation has necessarily cut back on home visits and supervision).

The defendant is currently incarcerated at the Federal Correctional Institute in Miami ("FCI Miami"), which houses a total of 936 inmates, all males. https://www.bop.gov/locations/institutions/mia/. As of November 5, 2020, five inmates and twenty-three staff have confirmed active cases of COVID-19 at FCI Miami. *See* https://www.bop.gov/coronavirus/index.jsp. One inmate and no staff members have died from the infection since the pandemic began. *Id*. 124 inmates and 14 staff members have recovered from COVID-19 at this facility. *Id*.

## IV.  LEGAL STANDARD AND ANALYSIS

Generally, "[t]he court may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582; *see also United States v. Puentes*, 803 F.3d 597, 605–06 (11th Cir. 2015) ("The law is clear that the district court has no inherent authority to modify a sentence; it may only do so when authorized by statute or rule."). One such statutory basis for a sentencing modification is the "compassionate release" provisions of Title 18, United States Code, Section 3582(c)(1)(A).

In order to grant compassionate release, a court must make the following findings: (1) that the defendant has exhausted all administrative rights with BOP, or the lapse of 30 days from the receipt of a request for such relief made to the warden of defendant's facility (whichever is earlier); (2) that the defendant has established "extraordinary and compelling reasons" for release; (3) that the applicable factors in 18 U.S.C. § 3553(a) warrant release; and (4) that release would be consistent with applicable policy statements issued by the Sentencing Commission. *See United States v. Stuyvesant*, – F. Supp. 3d – , No. 09-CR-60184-ALTMAN, 2020 WL 1865771, at *2 (S.D. Fla. April 14, 2020) (unpacking the statutory and regulatory requirements for compassionate release). As the moving party under Section 3582(c)(1)(A), the Defendant bears the burden of establishing the required elements. *See United States v. Hamilton*, 715 F.3d 328, 341 (11th Cir. 2013); *Stuyvesant*,

9

2020 WL 1865771 at *5; *United States v. Rodriguez-Orejuela*, – F. Supp. 3d –, No. 03-CR-20774-MORENO, 2020 WL 2050434, at *5 (S.D. Fla. Apr. 28, 2020). Furthermore, even if a defendant meets that burden, "the district court still retains the discretion to determine whether a sentence reduction is warranted." *Hamilton*, 715 F.3d at 341.

The Sentencing Commission has issued a policy statement addressing reduction of sentences under § 3582(c)(1)(A). As relevant here, the policy statement provides that a court may reduce the term of imprisonment after considering the § 3553(a) factors if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement." U.S.S.G. § 1B1.13.[2]

In addition to the defendant having attached to his pleading some of his medical records, the undersigned obtained the last two years of the defendant's medical records from the BOP and those are attached to this pleading separately under seal. The medical records indicate that the defendant has, among other medical issues, Type 2 diabetes and chronic kidney disease. The government acknowledges that, during the current COVID-19 pandemic, an inmate who presents Type 2 diabetes or chronic kidney disease, as confirmed by medical records, and who is not expected to recover from that condition, presents an extraordinary and compelling reason allowing compassionate release under the statute and guideline policy statement, even if that condition in ordinary times would not allow compassionate release.

---

[2] The policy statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement applies to motions filed by defendants as well.

However, this Court must consider all pertinent circumstances, including the 3553(a) factors and possible danger to the community. This Court must deny a sentence reduction unless it determines the defendant "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2). The Court must consider the § 3553(a) factors, as "applicable," as part of its analysis. *See* § 3582(c)(1)(A).

The defendant is a danger to the safety of the community. The offense conduct in this case involved carrying firearms in furtherance of drug trafficking crimes, drug trafficking, possession of a firearm while under a restraining order, unlicensed firearms dealing—all while the defendant operated a prostitution brothel. While the defendant has no prior convictions other than the underlying case, the PSR details numerous domestic violence related incidents. See PSR ¶¶ 52-61. As such, the nature and characteristics of the offense and the defendant's history show that he is a danger to the community.

While Defendant has exhibited good behavior since the start of his incarceration (the BOP has no disciplinary history for the defendant), he has served only about 70% of his sentence and still has approximately two years remaining. Releasing the defendant two years early would not adequately account for the severity of his crimes, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and properly avoid unwarranted sentencing disparities between defendants who have committed like offenses, among other factors. *See* 18 U.S.C. § 3553(a). *See also United States v. Esformes*, No. 16-CR-20549-SCOLA, Order on Defendant's Expedited Motion for Release Pending Appeal at 2 (Dkt. 1491) (S.D. Fla. Apr. 9, 2020) ("Attorney General William Barr's memo urging the release of particularly vulnerable inmates is not a get-out-of-jail-free card for every incarcerated person."). *Cf. United States v. Pimentel*, No. 19-CR-20229-SCOLA, Order on Motion for

Compassionate Release at 2 (Dkt. 216) (S.D. Fla. Aug. 5, 2020) (denying compassionate release to COVID-19-positive inmate at Coleman Low, noting (1) that defendant's vital signs, including temperature and oxygen level, were normal; (2) she does not have any serious chronic conditions that would make complications from the disease likely; and (3) the § 3553 factors weigh against her release because she was involved in a major health care fraud of over $3.5 million). The relatively low COVID-19 infection rate at FCI Miami also weighs against the defendant's request.

The defendant is unable to overcome the barrier imposed by the § 3553(a) factors and this Court should, therefore, deny his request for relief.

## VI.     CONCLUSION

For the forgoing reasons, the Court should deny the defendant's request for compassionate release or home confinement for failure to meet the prevailing standards.

>                Respectfully submitted,
>
>                ARIANA FAJARDO ORSHAN
>                UNITED STATES ATTORNEY
>
> By:     */s/ Marton Gyires*
>                Marton Gyires
>                Assistant United States Attorney
>                Court ID No.: A5501696
>                500 South Australian Avenue, 4th Floor
>                West Palm Beach, FL 33401
>                Tel.: (561) 820-8711
>                Email: Marton.Gyires@usdoj.gov

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and delivered the document and its attachment by United States Mail to *pro se* movant:

Armando Antonio Castro
97595-004
Miami FCI
Federal Correctional Institution
Inmate Mail/Parcels
Post Office Box 779800
Miami, FL 33177
PRO SE

                                            ARIANA FAJARDO ORSHAN
                                            UNITED STATES ATTORNEY

By:  *[signature]*
                                            Marton Gyires
                                            Assistant United States Attorney
                                            Court ID No.: A5501696
                                            500 South Australian Avenue, 4th Floor
                                            West Palm Beach, FL 33401
                                            Tel.: (561) 820-8711
                                            Email: Marton.Gyires@usdoj.gov